## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**RAYMOND HARTMANN,**

      **Plaintiff,**

        **v.**

**GRAHAM PACKAGING
COMPANY, L.P.,**

      **Defendant.**

                  **Case No. 1:19-cv-488**
                  **JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Plaintiff Raymond Hartmann ("Hartmann") takes prescription opioids for persistent pain. When he applied for a position at Defendant Graham Packaging Company, L.P. ("Graham") that required him to operate a forklift, Graham asked Hartmann to provide a physician's note confirming that his medications would not create safety concerns when he performed that job function. Hartmann provided three notes from his physician, but Graham found each wanting on that key issue. Graham declined to offer Hartmann the position, purportedly based on safety concerns. Hartmann then sued under the Americans with Disabilities Act ("ADA"), contending that Graham discriminated against him due to a disability, or at least based on Graham's perception that he was disabled.

The case is now before the Court on the parties' cross Motions for Summary Judgment (Def.'s Mot., Doc. 25; Pl.'s Mot., Doc. 26[1]). Both matters have been fully briefed, and the Court heard argument on those Motions on November 5, 2021.

For the reasons discussed more fully below, the Court **DENIES** both Graham's Motion for Summary Judgment (Doc. 25) and Hartmann's Motion for Partial Summary Judgment (Doc. 26).

## BACKGROUND

Hartmann was an unemployed machine and forklift operator. (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 29-1, #484[2]). Sometime in October 2017, William Russell, a Production Manager at Graham, contacted Hartmann. Russell had seen Hartmann's resume on a job recruiter site. (*Id.* at #485). On October 20, 2017, Hartmann and Russell met at Graham's Mason, Ohio, facility to discuss an available position as a Production Specialist, a job which entailed operating forklifts and other machinery. (*Id.*; Opp. to Pl.'s Mot., Doc. 29, #475; Hartmann Dep., Doc. 21, #92–93). During this meeting, Hartmann filled out a job application and Russell gave him a tour of the facility. (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 29-1, #485). Russell told Hartmann he wanted him to start working in November, assuming Hartmann passed a physical and drug test. (*Id.*).

---

[1] Although Graham moves for full summary judgment (Def.'s Mot., Doc. 25), Hartmann only seeks partial summary judgment—asking the Court to hold Graham liable as a matter of law, but proceeding to trial on the issue of damages. (Pl.'s Mot., Doc. 26).

[2] Refers to PAGEID #.

During this meeting, Hartmann also provided Russell a letter from his doctor, Rajesh Khanna. The letter, dated July 21, 2017, discussed certain narcotics that Dr. Khanna had prescribed Hartmann to treat a pinched nerve. (*Id.*; Hartmann Dep., Doc. 21, #95–96). As pertinent here, the letter provided that:

> Mr. Hartmann has been receiving treatment for numerous medical problems through my office. He is presently on a treatment regimen which includes tizanidine/Cymbalta/Seroquel/diazepam/oxycodone to address these issues. He has not had any difficulties with this medical treatment. He denies any impairment/difficulties encountered when these medications are taken. No concerns [have] been raised over his ability to perform his occupation/employment duties while on these medications.

(July 21 Khanna Ltr., Doc. 21-6, #172).

On October 24, 2017, Graham offered Hartmann a job, conditioned upon (among other things) Hartmann completing a pre-employment physical and drug screening. (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc 29-1, #486). Hartmann accepted the offer and submitted to his pre-employment physical and drug test at a Mercy Health ("Mercy") facility on October 31, 2017. (*Id.*).

Heather Younker, Graham's Plant Controller at the Mason, Ohio, facility, received the results of the physical and drug test on November 10, 2017. (*Id.* at #486–87). The results of the drug test were "negative," but the words "safety sensitive" were handwritten on the side of the report. (*Id.*). Younker had never seen a drug test result indicating an applicant was "safety-sensitive," so she contacted Mercy to learn more. (Younker Dep., Doc. 22, #198). A Mercy employee explained that the results were marked as safety sensitive due to Hartmann's medications. (Younker Statement, Doc. 22-5, #256). Younker testifies that she also asked the Mercy employee whether other

3

employers would hire applicants who Mercy had designated as safety sensitive. The employee responded that other employers would not, but told her that she "would need to see what Graham's policy was on that." (Younker Dep., Doc. 22, #202).

Younker then contacted Larry Silvey, Graham's Regional Director of Human Resources, to discuss Hartmann's test results. Following that call, Younker informed Hartmann that Graham would need a new letter from Dr. Khanna. (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 29-1, #488).

The record becomes somewhat muddled as to exactly what transpired next. It is clear, however, that Hartmann began communicating with Dr. Khanna's office, and that Dr. Khanna's office then issued two new letters. One letter, dated November 27, 2017, explained that Hartmann had been prescribed Adderall to treat Attention Deficit Disorder. (Nov. 27 Khanna Ltr., Doc. 21-5, #171). Another letter, dated November 21, 2017, detailed Hartmann's narcotics regimen. (Nov. 21 Khanna Ltr., Doc. 21-7, #173). But, as to the November 21 letter, apart from the new date (i.e., November 21), the substance of this letter mirrored the contents of the July 21 letter that Hartmann had provided Russell during his initial interview. (*Compare* Nov. 21 Khanna Ltr., Doc. 21-7, #173 *with* July 21 Khanna Ltr., Doc. 21-6, #172).

Moreover, although the November 27 "Adderall" letter is dated *after* the November 21 "narcotics" letter, the parties agreed during oral argument that the Adderall letter was, in fact, delivered to Younker first. The parties further agree that, after Younker received the November 27 "Adderall" letter, she informed Hartmann that Graham was not concerned about his Adderall prescription. (Younker Dep., Doc.

22, #229). Rather, she told Hartmann that Graham needed a letter addressing Hartmann's *narcotics* regimen. (Pl.'s Resp. to Def.'s Proposed Undisputed Facts, Doc. 28-1, #462, ¶ 35 (admitting to Def.'s Proposed Undisputed Facts, Doc. 25-1, #432, ¶ 35)).

But, while the parties agree that Graham wanted a letter from Hartmann's physician addressing that regimen, the parties do not necessarily agree regarding what the specific contents of that letter were to be. Both Hartmann and Younker indicated during their depositions that this new letter was meant to remedy a perceived defect in the original July 21 letter. But Hartmann and Younker describe the perceived defect a little differently. In his deposition, Hartmann stated that Graham asked for a "letter that was *more specific*, and, you know, up to date as well." (Hartmann Dep., Doc. 21, #119 (emphasis added)).[3] But during her deposition, Younker did not mention anything about asking for a letter that was "more specific." Rather she stated only that "I would have said that I needed a more recent note because [the original letter] was a July date. We're in November-December, and I needed a recent release." (Younker Dep., Doc. 22, #230–31).[4]

---

[3] During his deposition, Hartmann stated that Graham never asked that the letter confirm he could operate heavy machinery or a forklift. (Hartmann Dep., Doc. 21, #138). However, he offered no further explanation as to what he meant when he said Graham asked for a "more specific" letter. (*Id.* at #119).

[4] It is also unclear *when* this conversation between Younker and Hartmann occurred, or if they are even describing the same conversation. The November 21 "narcotics" letter appears to have been written almost a week before the November 27 "Adderall" letter, if the dates on the letters are to be believed. (Nov. 21 Khanna Ltr., Doc. 21-7, #173; Nov. 27 Khanna Ltr., Doc. 21-5, #171). Thus, unless Hartmann obtained the November 21 letter unprompted, it is likely that someone at Graham gave Hartmann an indication that he needed a new letter detailing his narcotics regimen before Younker ever received the Adderall letter. That said, Younker states that she requested a more "recent" letter detailing Hartmann's narcotics

In any event, Dr. Khanna's office issued the new November 21 letter once again detailing Hartmann's narcotics regimen. However, as the Court previously noted, this November 21 letter was otherwise identical to the original July 21 letter. (*Compare* Nov. 21 Khanna Ltr., Doc. 21-7, #173 *with* July 21 Khanna Ltr., Doc. 21-6, #172). Younker received the November 21 letter no later than December 4, 2017. (Younker Dep., Doc. 22, #212).

That day, Younker emailed the new letter to Larry Silvey and asked if Graham could proceed with hiring Hartmann. (Email from H. Younker to L. Silvey, Doc. 22-4, #255). Silvey responded later that same day, noting that the hiring could proceed, but at the same time urging some caution:

> [y]es, but some of these are very powerful medications. Oxycodone is for serious pain symptoms. Personally I would be reluctant to put this person in my workforce. I would definitely have a discussion around the physical requirements of the position, the hours, etc. Ray must report when on any of these medications to his supervisor.

(*Id.*).

Over the new few days, Younker discussed Hartmann's application with William Russell and Kathy Whitney, a plant manager at Graham. (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 29-1, #490). The three then called Silvey to discuss the issue further. Silvey advised them not to hire Hartmann because his medication presented a safety concern. (*Id.*). On December 18, 2017, Hartmann went to Graham to discuss his application. (*Id.*). When he arrived, Younker informed him

---

regimen *after* she received the November 27 "Adderall" letter. (Younker Dep., Doc 22, #230). Thus, it is unclear when Graham made the request that prompted Hartmann to have Dr. Khanna's office create the November 21 "narcotics" letter or what Graham asked that this letter specifically include at that time.

that Graham could not hire him as a forklift operator because it concluded he was a "safety hazard." (*Id.*).

Hartmann sued on July 1, 2019, (*see* Compl., Doc. 1), asserting claims under the Americans with Disabilities Act ("ADA") and Ohio's parallel anti-discrimination statute, Ohio Rev. Code ("O.R.C.") § 4112.02. (*Id.*). Graham filed its Answer (Doc. 3) on August 30, 2019. The parties cross-moved for summary judgment on March 1, 2021. (Doc. 25; Doc. 26).

## LEGAL STANDARD

In evaluating the parties' cross-motions for summary judgment, the Court keeps in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.,* No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). But the non-moving party cannot defeat a motion for summary judgment merely by pointing to any factual dispute. As the Sixth Circuit has explained, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

When both parties move for summary judgment, that does not change the analysis the Court applies to each party's motion. Rather, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Black v. Pension Benefit Guaranty Corp.*, 973 F.3d 576, 581 (6th Cir. 2020) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quotation marks omitted)). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting cases).

## LAW AND ANALYSIS

Hartmann brings claims under both the ADA and Ohio's anti-discrimination statute, O.R.C. § 4112.02. (Compl., Doc. 1, #4). However, "[b]ecause 'Ohio's disability discrimination law parallels the [Americans with Disabilities Act] in all relevant respects,' this court 'appl[ies] the same analytical framework, using cases and regulations interpreting the ADA as guidance in [the] interpretation of' Ohio Rev. Code § 4112.02." *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015) (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008), and citing *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998)).

Title I of the ADA states that an employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA explicitly defines an employer's failure to hire based on an applicant's known disability as a type of this forbidden discrimination. *See id.* at § 12112(b)(5).

A plaintiff can establish a claim of disability discrimination through either direct or indirect evidence, each of which requires the Court to apply a different analytical framework. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997)). "Direct evidence of disability discrimination" is evidence that "does not require the fact finder to draw any inferences [to conclude] that the disability was at least a

motivating factor." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (quoting *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018)). For example, in *Baum v. Metro Restoration Services,* the Sixth Circuit applied a direct evidence framework where an employer told an employee with a heart condition that he was being fired because of his "health issues and doctor's appointments." 764 F. App'x 543, 547 (6th Cir. 2019).

In contrast, if direct evidence of discrimination is not available, courts apply an indirect evidence framework. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019). Indirect evidence "requires an inference to conclude there was discrimination," in which case, "a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework." *Doe v. Livonia Pub. Sch.,* No. 13-cv-11687, 2018 WL 4953086, at *17 (E.D. Mich. Oct. 12, 2018) (citing *Gohl. v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016), in turn citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

In this case, both parties agree that Graham declined to hire Hartmann due to concerns that his opioid regimen would create a workplace safety hazard. (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 29-1, #490). While the parties can—and do—disagree as to whether the effects of a medication regimen can constitute a disability within the meaning of the ADA, answering that question requires the Court to make a legal determination about the scope of the ADA, rather than resolving a factual inference about the underlying basis of Graham's decision. Accordingly, in the Court's view, a direct evidence framework applies to this case. In other words, Hartmann's

sole claim here is that Graham discriminated against him based on misgivings about the side effects of his medications. If such side effects can constitute a disability, then Hartmann is making a direct evidence claim, because then the Court's analysis would require no inferential step to conclude there was discrimination. On the other hand, if such side effects *cannot* constitute a disability, then Hartmann has no discrimination claim under the ADA at all. And whether or not side effects can constitute a disability is a question of law for the Court. Thus, this is not a case about factual inferences, meaning the indirect evidence framework is inapplicable.

In the Sixth Circuit, the direct evidence framework proceeds as a three-part test. First, the plaintiff bears the burden of establishing that he or she has a disability. *Fisher,* 951 F.3d at 417. "To ultimately carry this burden, an individual must: (1) be actually disabled, i.e., suffer from 'a physical or mental impairment that substantially limits one or more major life activities,' (2) have 'a record of such an impairment,' or (3) be 'regarded as having such an impairment.'" *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 444 (6th Cir. 2018) (quoting 42 U.S.C. § 12102(1)). In this case, Hartmann alleges that he is disabled only under the third "regarded-as" prong.[5] (Reply in Supp. of Pl.'s Mot., Doc. 32, #514).

---

[5] Hartmann briefly suggests in his Motion that he is also pursuing his claim under the ADA's second "record of impairment" prong. (Doc. 26, #438 (stating that "[t]here is no doubt that Mr. Hartmann has a 'record' of being disabled. Mr. Hartmann's physician provided multiple letters identifying the controlled substances he prescribed to treat Mr. Hartmann's symptoms related to his pinched nerve.")). However, Hartmann did not develop this argument at length in his Motion and disregarded it entirely in his Reply (Doc. 32). Accordingly, the Court deems this argument waived. *Scheib v. Boderck*, No. 3:07-cv-446, 2013 WL 6046089, at *3 (E.D. Tenn. Nov. 14, 2013) (quoting *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

Second, the plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position. *Fisher,* 951 F.3d at 417. Under the ADA, a plaintiff is "otherwise qualified" if he or she is capable of performing the position's essential functions. 42 U.S.C. § 12111(8). Accordingly, to prevail on this step, the plaintiff must show either: (1) the disability does not impact his or her ability to perform the job's functions in any way; (2) the disability impacts the plaintiff's ability to perform *some* job functions, but only functions plaintiff alleges are non-essential; or (3) the disability impacts the plaintiff's ability to perform some essential job functions, but he or she could perform all essential functions with an accommodation plaintiff alleges is reasonable. *Ferrari v. Ford Motor. Co.*, 826 F.3d 885, 891 (6th Cir. 2016).

Third, if the plaintiff successfully clears both of those hurdles, then the burden shifts to the employer. What the employer must show at this step, however, depends on how the employee went about meeting his burden at the second step. If the employee identified what he claims is a non-essential job requirement (i.e., one that that the employer could eliminate), the burden is on the employer to show that the job requirement is in fact essential. *Id.* Similarly, if the employee identified a proposed reasonable accommodation, the employer bears the burden of showing that the proposed accommodation is in fact unreasonable. *Id.*

If, however, an employee proceeds under the first option of step two (i.e., claiming that the asserted disability does not impact the employee's ability to perform

---

argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.").

the job at all), consideration of this third step does not arise. That is what Hartmann argues here. That is, he is not arguing that he is restricted in performing any alleged "non-essential" functions, nor does he propose any reasonable accommodations.[6] Rather, he simply maintains that he can do the job, as is, notwithstanding his medications. If the undisputed facts show that is true, there is no showing that the employer could make at the third stage to overcome Hartmann's proof at the second step. Conversely, if the undisputed facts show that it is not true, i.e., that Hartmann cannot do the job as he claims, then Hartmann loses at the second step. Either way, the third step is irrelevant.

Thus, because the third step does not apply to this case, the Court is effectively confronted with a two-step inquiry. First, has the plaintiff shown that he was "disabled" within the meaning of the ADA's regarded-as prong? Second, can the plaintiff show that he was "otherwise qualified" for the job—that is, has he shown he could perform all the job's functions and do so without an accommodation? As noted above, the plaintiff bears the burden on both of the two issues, and thus at the summary judgment stage must establish at least a genuine dispute of material fact as to both. The Court addresses each of these questions in succession.

---

[6] Additionally, where—as here—a plaintiff proceeds solely under a regarded-as disabled theory, "the employer is presumed to have no obligation to provide any reasonable accommodation." *EEOC v. M.G.H. Family Health Ctr.*, 230 F. Supp. 3d 796, 811 (E.D. Mich. 2017) (citing 42 U.S.C. § 12201(h)). Accordingly, even if Hartmann had proposed a reasonable accommodation in this case, the Court would have no reason to consider it.

**A.** **The Undisputed Facts Show That Graham Failed To Hire Hartmann Because It Regarded Him As Impaired Due To The Side Effects Of His Medical Treatment.**

The first question is whether Hartmann was disabled under the ADA. As previously explained, Hartmann proceeds solely under the "regarded-as" prong of the ADA. According to the ADA, an individual satisfies the "regarded-as" prong "if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment." Importantly, though, unlike in an actually-disabled case, for a regarded-as claim, the alleged impairment need not limit a major life activity. Rather, the statutory language expressly states that an actual or perceived physical or mental impairment can support a regarded-as claim "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3). That being said, a plaintiff is not "regarded-as" disabled if the alleged impairment is "transitory and minor." *Id*. "A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id*.

Hartmann alleges that Graham regarded him as disabled within the meaning of the ADA because of its "assumption that Mr. Hartmann had a physical or mental impairment caused by his medications." (Reply in Supp. of Pl.'s Mot., Doc. 32, #515). Graham responds that it could not have regarded Hartmann as disabled because Graham did not "kn[o]w about his impairment or disability. The record evidence shows only that Graham was aware of [Hartmann's] opioid regimen, not any actual disability." (Def.'s Opp. to Pl.'s Mot., Doc. 29, #473). In other words, Graham appears to argue that the ADA's definition of disability does not extend to impairments caused

by the side effects of medical treatment, but rather extends only to impairments arising from the underlying condition being treated.

Graham's argument on this front is difficult to reconcile with either Equal Employment Opportunity Commission ("EEOC") regulations or case law interpreting the ADA. In the 2008 amendments to the ADA (i.e., the "Americans with Disabilities Act Amendments Act" or "ADAAA"), Congress granted the EEOC authority "to issue regulations implementing the definitions of disability in [the ADA.]" 42 U.S.C. § 12205A. Although the parties to this case did not raise it, either in briefing or at oral argument, it appears that the EEOC has exercised that authority to address the issue of disabilities resulting from the side effects of medical treatment. As relevant here, 29 C.F.R. § 1630.2(j)(4)(ii) states that, in considering whether an impairment is "substantially limiting," courts should consider the "condition, manner, or duration" of the impairment, including "the non-ameliorative effects of mitigating measures, *such as negative side effects of medication* or burdens associated with following a particular treatment regimen[.]" (Emphasis added). To be sure, the "substantially limited" test is not strictly part of a regarded-as claim, but the Court takes from this regulation the principle that the EEOC intends the negative side effects of medication to be part of the disability inquiry.

Case law points that way, as well. Although the Sixth Circuit has never directly addressed how courts should consider side effects for the purposes of establishing a disability claim, language in at least some decisions suggests that impairments caused by medications count. *See, e.g.*, *Daugherty v. Sajar Plastics*, 544

F.3d 696, 701 (6th Cir. 2008) (considering ADA claim where plaintiff was terminated based on side effects of medicines, but dismissing it on other grounds); *see also Ferrari* 826 F.3d at 895 (6th Cir. 2016).[7] And district courts in this circuit have reached that same conclusion, albeit without much discussion of the issue. *Jamison v. Dow Chem. Co.*, 354 F. Supp. 2d 715, 728 (E.D. Mich. 2004) ("if the medication itself produces disabling side-effects, a finding of disability is appropriate") (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 484 (1999), overturned by statute on other grounds (2009)); *EEOC v. Overnite Transp. Co.*, No. 2:02CV591, 2006 WL 2594479, at *8 (S.D. Ohio July 5, 2006) (same).

As these district court decisions note, the Supreme Court's opinion in *Sutton* likewise at least suggests that the ADA's individualized inquiry included consideration of "any negative side effects suffered by an individual resulting from the use of mitigating measures." *Sutton*, 527 U.S. at 484. Moreover, the Supreme Court reached that decision even before Congress expanded the scope of the term "disability" by enacting the ADAAA. Decisions from other circuits offer some support

---

[7] Graham cited to *Ferrari* in its Reply to support the proposition that "documentation evidencing opioid use does not suffice as a substantial limitation in and of itself." (Doc. 31, #500). But, importantly, the *Ferrari* court did not reject the plaintiff's disability claim on the basis that the side effects of medications could *never* constitute a disability for the purposes of the ADA. Rather, the plaintiff's case failed because he could not show his opioid use was substantially limiting. *Ferrari,* 826 F.3d at 893–94. This suggests that the side effects of medical treatment could constitute disabilities under the ADA, so long as they satisfy the Act's other requirements.

Moreover, to the extent Graham argues that Hartmann's case similarly fails because he has not shown his opioid use is substantially limiting, that argument is without merit because the Sixth Circuit now recognizes that an impairment under the regarded-as prong does not need to be perceived as substantially limiting to be considered a disability under the ADA. *Barlia*, 721 F. App'x at 445 (citing 42 U.S.C. § 12102(3)).

for that result, as well. *See Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 187 (3d Cir. 2010) ("side effects from medical treatment may themselves constitute impairments under the ADA"); *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30, 33 (1st Cir. 2001) (noting the court would "assume without deciding that dementia induced by chemotherapy is a covered impairment"); *Gordon v. E.L. Hamm & Assocs.*, 100 F.3d 907, 912 (11th Cir. 1996) (assuming the side effects suffered as a consequence of chemotherapy to be an impairment under the ADA).

Based on the Court's review of the above-cited regulations and case law, the Court concludes that the negative side effects of medicine or other medical treatment can constitute an impairment for purposes of the ADA.

That being said, in *Sulima v. Tobyhanna Army Depot*, the Third Circuit found that this category of disability claims is subject to an important limitation. 602 F.3d at 187. Specifically, because "the concept of a 'disability' connotes an involuntary condition, [] if one can alter or remove the 'impairment' through an equally efficacious course of treatment, it should not be considered 'disabling.'" *Id*. Thus, the Third Circuit held that:

> for a treatment's side effects to constitute an impairment under the ADA, it is not enough to show just that the potentially disabling medication or course of treatment was prescribed or recommended by a licensed medical professional. Instead … the medication or course of treatment must be required in the prudent judgment of the medical profession, and there must not be an available alternative that is equally efficacious that lacks similarly disabling side effects.

*Id*. (internal quotation marks omitted). Other courts have adopted that approach, as well, *see Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051, 1052 (7th Cir. 1997)

17

(stating that "if a medical condition that is not itself disabling nevertheless *requires*, in the prudent judgment of the medical profession, treatment that is disabling, then the individual has a disability within the meaning of the Act, even though the disability is, as it were, at one remove from the condition" (emphasis added)), including at least one district court in this circuit, *see Sanders v. Judson Ctr., Inc.,* No. 13-cv-12090, 2014 WL 3865209, at *4 (E.D. Mich. Aug. 6, 2014) (adopting the *Sulima* test in assessing a plaintiff's ADA claims).

So, for example, in *Sulima*, the Third Circuit rejected the plaintiff's argument that he was disabled due to side effects from his medication, in part because there was "no evidence in the record to show that the specific medications causing the side effects were, in the judgment of the medical profession, the only efficacious medications for [the plaintiff]." *Sulima*, 602 F.3d at 187. On the contrary, the plaintiff's doctor stated that, had he been aware of the problems the plaintiff was experiencing, "[he] would have stopped" prescribing the medication. *Id.*

Importantly, though, the *Sulima* Court only applied this test in the context of a disability claim brought under § 12102(1)(A) (a plaintiff alleging that he was actually disabled, rather than regarded as disabled), and thus that court did not have occasion to expressly address whether this test also applies to regarded-as claims under § 12102(1)(C).[8] That being said, more recent decisions applying *Sulima* have

---

[8] Although the plaintiff in *Sulima* brought a regarded-as claim in addition to his actually-disabled claim, the *Sulima* Court did not need to address whether its medically-required test applied to the regarded-as claim. *Sulima*, 602 F.3d at 187–88. This is because the court found that, even if the plaintiff was regarded as disabled because of the side effects of his medication, he "did not allege any facts to support a conclusion that his employers thought that [his] gastrointestinal problems were going to last for an extended period of time." *Id.*

applied that same test to regarded-as claims. For example, in *Whitmire v. Walmart,* 359 F. Supp. 3d 761, 793–94 (D. Ariz. 2019), the plaintiff brought a regarded-as disabled claim after her employer terminated her because of her medical marijuana use. The court applied the *Sulima* test and found the plaintiff's claim unsustainable because she had "not demonstrated that no other equally effective alternatives exist which lack the side-effects that medical marijuana has." *Id.* at 795 (citing *Sulima,* 602 F.3d at 187). Similarly, in *McDonald v. Pennsylvania State Police*, No. 2:09-cv-442, 2012 WL 5381403 (W.D. Pa. Oct. 31, 2012) (aff'd *McDonald v. Pennsylvania State Police*, 532 F. App'x 176 (3rd Cir. 2013)), the court rejected the plaintiff's regarded-as disabled claim after he was denied a professional certification because of his use of narcotic pain relievers. The Court found that the plaintiff had failed to satisfy the *Sulima* test because "there [was] no evidence in the record that [the narcotic pain reliever] was the 'only efficacious medication'" available to treat his underlying condition. *Id.* at *11 (citing *Sulima*, 602 F.3d at 187).

Despite such cases, though, the Court is not convinced that *Sulima's* test should apply to regarded-as claims. In the actually-disabled context, the employee is conceding a disability, and is typically requesting some form of accommodation from the employer to account for it. In that setting, it perhaps makes sense to ask whether the employee could avoid the problem entirely by switching to some equally efficacious alternative treatment. But that reasoning does not carry over to regarded-

---

Thus, the plaintiff's impairments or perceived impairments resulting from his medication were merely "transitory," and they could not sustain a regarded-as claim under § 12102(1)(C). *Id.*

as claims. As to such claims, the employee is not asserting that he or she is actually disabled, but rather that the employer wrongly *perceives* the employee to be. So, in a medical side effects case, for example, the employee is claiming that the employer wrongly perceives the employee to be disabled due to the medical regimen. In that setting, it makes no sense to ask whether the employee could switch to an equally efficacious treatment that does not cause a disability—the employee maintains that the *current* treatment is not resulting in any such disability. And the Court can discern no reason to require an employee to show that he or she could not switch to another treatment that would not give rise to such a misapprehension on the part of the employer.

At bottom, in the absence of Sixth Circuit precedent directly on point, the Court concludes that the *Sulima* test does not apply to regarded-as claims. Thus, an employee can assert such a claim without first needing to show the absence of an equally efficacious (and less impairing) alternative treatment.

Accordingly, the Court finds that Hartmann has made the necessary showing at step one. The undisputed facts show that Graham made its decision not to hire Hartmann because Graham believed that the side effects of Hartmann's medical treatment rendered him unable to safely operate a forklift, as the Production Specialist job would require. (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 29-1, #490). That is, Graham took into account Hartmann's perceived disabilities arising from his opioid regimen. That suffices to show that that Graham regarded Hartmann as disabled for purposes of an ADA claim.

20

**B.      There Is A Genuine Dispute Of Fact As To Whether Hartmann Was Otherwise Qualified For The Position Of Forklift Operator.**

The second question the Court must consider is whether Hartmann was "otherwise qualified" for the forklift operator position despite his disability.

As previously explained, an employee is "otherwise qualified" if he or she can perform the essential functions of the position in question, either with or without a reasonable accommodation. If the employee (or, in this case, would-be employee) alleges that he or she could only do the job if certain non-essential functions were eliminated or if reasonable accommodations were granted, then the employer would then have the opportunity to show that these allegedly non-essential functions are, in fact, essential, or that the proposed accommodation is not reasonable. *Fisher*, 951 F.3d at 417. But here, Hartmann has not proposed any reasonable accommodations or argued that there are any non-essential functions he could not perform. Accordingly, the only question facing the Court is whether the undisputed facts show that Hartmann could perform all the functions of a Production Specialist.[9]

On that front, Hartmann has presented evidence that, despite his disability, he was capable of performing the functions of a Production Specialist. Specifically, prior to applying for the position with Graham, Hartmann had held a similar job at another company where he operated forklifts and machinery—and did so while taking the same medications. (Reply in Supp. of Pl.'s Mot., Doc. 32, #517). Moreover,

---

[9] Additionally, as stated previously, even if Hartmann attempted to propose an accommodation, the Court could not consider it because he only pursues his claim under a regarded-as disabled theory. *M.G.H. Family Health Ctr.*, 230 F. Supp. 3d at 811 (citing 42 U.S.C. § 12201(h)).

Hartmann apparently held this prior role without any safety incidents. (*Id.*). This offers at least some support for the proposition that, despite his disability, Hartmann was qualified for the job at Graham.

Graham, of course, responds that Hartmann "was not qualified for the position." (Opp. to Pl.'s Mot., Doc. 29, #475). Specifically, Graham argues that Hartmann's opioid regimen rendered him a risk to the "health and safety" of others. (*Id.*).

Graham starts on solid legal footing. A "disabled individual is not 'qualified' for a specific employment position if he poses a 'direct threat' to the health or safety of others that cannot be eliminated by a reasonable accommodation." *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 12 (6th Cir. 2012) (quoting *Holiday v. City of Chattanooga*, 206 F.3d 637, 647 n.4 (6th Cir. 2000)). But it is not sufficient for an employer to simply argue that no person with a given disability is ever qualified for a certain job or position. Indeed, such arguments risk denying positions to individuals based on exactly the kinds of "stereotypes and generalizations about a disability" the ADA was designed to prevent. *Keith v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013). Rather, employers are required to conduct what is known as the "individualized inquiry" to determine whether the "employee's disability or other condition disqualifies [that employee] from a particular position." *Holiday,* 206 F.3d at 643.

Where an employer can show that it completed the individualized inquiry prior to taking the challenged adverse employment action (i.e., here, failing to hire

Hartmann), the Sixth Circuit has indicated that the results of that inquiry should be afforded great deference by the court. *See, e.g., Michael v. City of Troy Police Dep't,* 808 F.3d 304, 309 (6th Cir. 2015) (stating that "reasonable doctors of course can disagree … as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct"); *Wurzel,* 482 F. App'x at 11 (the employee "cannot prevail … where the record establishes as a matter of law that [the employer's] determination that [the employee] posed a direct threat was based on a reasonable medical judgment, which relied on the most current medical knowledge and best available objective evidence and reflected an individualized assessment of [the employee's] abilities").

But, as further explained below, where the individualized inquiry was never completed, the question then becomes which party caused the inquiry to breakdown. *See Rorrer v. City of Stow,* 743 F.3d 1025, 1040 (6th Cir. 2014) (stating that "the individualized inquiry is an interactive process in which both parties have a duty to participate in good faith") (internal quotation marks omitted). For example, if the individualized inquiry was not completed because the employee (or would-be employee) failed to cooperate in good faith, then the employer's failure to complete the inquiry is excused and the employee's ADA claim fails.

On the other hand, even if it was the employer that caused the individualized inquiry to break down, the employer might still *theoretically* prevail if it can show the employee was simply not qualified for the position. But courts in this Circuit have

proven extremely reluctant to grant summary judgment to an employer when the employer did not attempt to complete the individualized inquiry. *See, e.g.*, *Holiday,* 206 F.3d at 643; *Denoewer v. Union Cnty. Indus.,* 2020 WL 1244194, at *7 (S.D. Ohio Mar. 16, 2020). This is likely because, without a completed individualized inquiry that is entitled to deference, a court typically is forced to weigh competing evidence as to whether a given employee is qualified for a position—an issue of fact generally ill-suited for adjudication at the summary judgment stage. Accordingly, when an employer failed to complete an individualized inquiry, and cannot show that this failure stemmed exclusively from the employee's failure to participate in the process in good faith, summary judgment in the employer's favor is generally inappropriate.

Putting that all together, Graham can win its Motion for Summary Judgment if it can show *any one* of the following as a matter of undisputed fact: (1) that Graham completed the individualized inquiry; (2) if not, that Graham did not cause the inquiry to break down, or (3) if not, that Hartmann was not qualified for the position. In contrast, to prevail on his Motion for Summary Judgment, Hartmann must show *all* of the following as a matter of undisputed fact: (1) that Graham did not complete the individualized inquiry; (2) that Hartmann did not cause the inquiry to break down; *and* (3) that Hartmann was qualified for the forklift operator position.

### 1. There Is A Genuine Dispute Of Fact As To Whether Graham Completed The Individualized Inquiry.

The first question is whether Graham completed an individualized inquiry. According to the Sixth Circuit, the individualized inquiry must examine "the individual's actual medical condition, and the impact, if any, the condition might have

on the individual's ability to perform the job in question." *Holiday*, 206 F.3d at 643.

This requirement reflects the purpose of the ADA, which obligates "employers to act,

not based on stereotypes or generalizations about a disability, but based on the actual

disability and the effect that disability has on the particular individual's ability to

perform his job." *Keith*, 703 F.3d at 923. For example, in *Keith*, the court found that

a doctor failed to complete an individualized inquiry, observing that:

> [a]fter Dr. Work entered the examination room and briefly reviewed [the plaintiff's] file, he declared, 'he's deaf; he can't be a lifeguard.' Dr. Work made no effort to determine whether, despite his deafness, [the plaintiff] could nonetheless perform the essential functions of the position, either with or without reasonable accommodation. Indeed, Dr. Work has no education, training, or experience in assessing the ability of deaf individuals to work as lifeguards. Dr. Work's cursory medical examination is precisely the type that the ADA was designed to prohibit.

*Keith,* 703 F.3d at 923–24. Similarly, in *Holiday*, the court found that a genuine issue

of fact remained as to whether the defendant completed an individualized inquiry

when its doctor's

> "report" consist[ed] of two scribbled lines at the bottom of a boilerplate evaluation form. … Moreover, the record [was] replete with factual evidence available to the [employer] at the time—particularly [the plaintiff's] successful performance of police jobs that Dr. Dowlen claimed he was unqualified to do—that flatly contradicted Dr. Dowlen's unsubstantiated conclusion.

*Holiday,* 206 F.3d at 646. Thus, in order to complete an individualized inquiry, an

employer (or its representatives) must examine the employee or applicant with a

certain level of thoroughness, bearing in mind the specific functions of the position in

question and the employee's ability to perform those functions in light of all available

evidence.

Moreover, when an employer declines to hire an applicant specifically out of concerns that the applicant's disability renders the applicant a direct threat to workplace safety, there are four factors the employer should consider in conducting the individualized inquiry. *Boike v. Akal Sec., Inc.,* No. 2:17-cv-10109, 2019 WL 4747735, at *12 (E.D. Mich. Sept. 30, 2019). These factors are: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." *Id.* (citing 29 C.F.R. § 1630.2(r)). "With regard to the risk presented, an employer is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e. high probability, of substantial harm; a speculative or remote risk is insufficient." *Wurzel,* 482 F. App'x at 12 (internal quotation marks and modifications omitted).[10]

While the individualized inquiry requirement can place a heavy burden on employers, the Sixth Circuit has indicated that courts should reward employers who conduct the inquiry with a significant degree of deference as to the inquiry's results.

---

[10] There remains some uncertainty in the Sixth Circuit as to which party bears the burden in the direct threat analysis. *See, e.g., Wurzel,* 482 F. App'x at 12 n.14. As this Court has previously explained, "in some instances, the burden is placed on the Plaintiff to prove that he or she does not pose a threat pursuant to the 'qualified individual' analysis, whereas in other instances, Defendant bears the burden of proving 'direct threat' when it is asserted as a generalized 'affirmative defense.'" *Denoewer*, 2020 WL 1244194, at *13 (citing *Wurzel*, 482 F. App'x at 12 n.14). In this decision, the Court treats the direct threat issue as part of the qualified individual analysis, rather than as a separate affirmative defense. However, even if the Court treated the direct threat argument as an affirmative defense, and thus shifted the burden to Graham, the Court's ultimate ruling would not change because Hartmann has not demonstrated that Graham cannot show he was a direct threat.

In *Michael v. City of Troy Police Department,* for example, the Sixth Circuit considered a rejected job applicant's argument that the employer's thorough individualized inquiry had reached the incorrect conclusion:

> Reasonable doctors of course can disagree—as they disagree here—as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an "objectively reasonable" opinion, rather than an opinion that is correct. Indeed, in many cases, the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be unknowable—unless the employer runs the very risk that the law seeks to prevent. Here, the City was not required to invite a section 1983 claim later in order to avoid an ADA claim now. Right or wrong, the opinions upon which the City relied were objectively reasonable; and that means the City is not liable.

*Michael,* 808 F.3d at 309 (internal citations omitted). Thus, if Graham undertook an individualized inquiry which "relied on the most current medical knowledge and best available objective evidence" and considered Hartmann's abilities in light of the direct threat factors before deciding not to hire him, then that decision would be entitled to great deference from this Court. *Whirlpool,* 482 F. App'x at 11.

But here, there remains a genuine dispute of fact as to whether Graham completed its individualized inquiry and whether it properly considered the relevant factors. To the extent that Graham undertook an inquiry, it appears to have consisted of three steps. First, after Hartmann's drug test confirmed he was taking the medications he had disclosed, Younker reached out to Mercy to ask whether Hartmann could work as a Production Specialist. (Younker Dep., Doc. 22, #202). Second, Younker requested Hartmann to provide her with letters from his doctor saying he could work as a Production Specialist. (*Id.* at #229–31). Third, Younker and

her colleagues at Graham met and discussed Hartmann's application, before ultimately deciding not to hire him. (*Id.* at #214). While the Court cannot foreclose the possibility that these steps, collectively, may have constituted a complete individualized inquiry, they do not compel the conclusion that the inquiry was complete as a matter of law.

First, Younker's communications with Mercy cannot satisfy the individualized inquiry requirement because the hospital specifically declined to comment on whether Hartmann could perform the job functions. According to Younker's deposition, after she received Hartmann's drug test results indicating that he was "safety-sensitive," she contacted Mercy. "I asked [the hospital] what safety sensitive meant and why it was listed, and if other employers hired people who had safety sensitive …. [Mercy] mentioned that would be something that I would need to speak to Graham about, and that other companies haven't, but I would need to see what Graham's policy was on that." (*Id.* at #202). To the extent the communications with Mercy revealed anything, it was only that Hartmann was (a) on a medication regimen, and (b) that this medication regimen warranted further investigation by Graham. Thus, Younker's communications with Mercy do not necessarily satisfy the individualized inquiry requirement, as Mercy explicitly declined to state whether Hartmann's medication regimen was disqualifying.

Second, Younker's requests for letters do not satisfy the individualized inquiry because, to the extent the resulting letters offered Graham any guidance in its decision-making, it was *in favor* of hiring Hartmann, or at least, pointed in favor of

engaging in further inquiry. The relevant letters from Dr. Khanna both stated that Hartmann "has not had any difficulties with [his] medical treatment …. No concerns have been raised over his ability to perform his occupation/employment duties while on these medications." (July 21 Khanna Ltr., Doc. 21-6, #172; Nov. 21 Khanna Ltr., Doc. 21-7, #173).

Admittedly, the language in Dr. Khanna's letters is vague. Hartmann argues that the letters were "release[s] from his physician indicating that he was able to work while on the medication." (Pl.'s Mot., Doc. 26, #440). In contrast, Graham argues that the specific language of the letters only speaks to *Hartmann's own* belief that he could do the job, and reflected "absolutely no assessment … by the physician as to whether [Hartmann] could operate a forklift while on his course of opioids." (Def.'s Mot., Doc. 25, #421).

Graham's argument on this issue could be interpreted in one of two ways. First, Graham may be arguing that it attempted to engage in an individualized inquiry by requesting releases from Hartmann, but Hartmann thwarted these efforts by repeatedly failing to provide what Graham sought (that is, an explicit release from Dr. Khanna). Understood that way, though, Graham's argument relates to whether Hartmann participated in the individualized inquiry in good faith. The Court addresses that issue in the next section, but it is not the question here.

Rather, the question here is whether Dr. Khanna's letters were sufficient to *complete* the individualized inquiry. On that front, Graham appears to be arguing that, after repeatedly receiving letters from Dr. Khanna that failed to directly address

whether, in the doctor's view, Hartmann could work, Graham should have been allowed to read between the lines and find Dr. Khanna was implicitly telling Graham not to hire Hartmann.

But, if that is the argument, Dr. Khanna's letters simply will not bear the weight Graham ascribes to them. In both *Keith* and *Holiday*, for example, the Sixth Circuit found that employers had not completed the individualized inquiry even where they had obtained clear recommendations from physicians not to hire the plaintiffs. *Keith,* 703 F.3d at 923–24; *Holiday,* 206 F.3d at 646. In this case, the letters from Dr. Khanna did not even provide the type of unambiguous recommendation that the courts found wanting in those cases. Indeed, if anything, Dr. Khanna's letters suggest that Hartmann *was* capable of performing the job. Even assuming that Dr. Khanna impliedly recommended against hiring Hartmann, because the letters provide no evidence that would support such a conclusion, they would have been insufficient to complete the individualized inquiry. Thus, to the extent that Graham relies on the letters from Dr. Khanna to support the conclusion that it completed the individualized inquiry, the Court finds this argument without merit.

Finally, the Court considers the internal conversations held at Graham after Younker received Dr. Khanna's letters. In fairness to Graham, Sixth Circuit case law makes clear that an individualized inquiry need not be conducted by a medical professional. For example, in *Keith*, the Sixth Circuit stated that the individualized inquiry was complete because county officials observed the plaintiff during lifeguard training sessions before deciding not to hire him. *Keith,* 703 F.3d at 924. Similarly, in

*Michael v. City of Troy Police Department*, the Sixth Circuit stated that "'testimonial evidence' concerning the employee's behavior" could also constitute an effective individualized inquiry. 808 F.3d at 307.

Here, though, both parties have failed to develop the record sufficiently for the Court to conclude that Graham either did, or did not, complete the individualized inquiry by virtue of these internal conversations. In describing these discussions, Younker states only that, after she received the last of the Khanna letters, "Bill, myself, and Kathy Whitney (plant manager) met sometime over the next couple of days and discussed the results and contacted Larry Silvey[,] who informed us that we should not hire Raymond due to the strong medications he is taking and the safety concern." (Younker Statement, Doc. 22-5, #258). The record does not reveal, however, how thorough these conversations were, whether they considered Hartmann's individualized ability to perform the role of a Production Specialist in light of the direct-threat factors, and what evidence Graham relied upon in reaching its decision. Thus, while the Court cannot foreclose the possibility that there were conversations within Graham that would have satisfied the individualized inquiry, at this stage the record is insufficiently developed to compel that conclusion.

In short, the Court concludes that neither party has established, as a matter of undisputed fact, that the individualized inquiry was, or was not, completed. That failure, though, has different implications for the two parties. As noted at the outset, Hartmann's inability to show as a matter of undisputed fact that Graham failed to complete the individualized inquiry suffices, in and of itself, to doom Hartmann's

Motion for Summary Judgment (Doc. 26), and accordingly the Court **DENIES** that motion. Graham, however, still could succeed on its cross-motion, but only if Graham can show as a matter of undisputed fact either (1) that Hartmann failed to participate in the individualized inquiry in good faith, or (2) that Hartmann was not qualified. The Court turns to those two issues next.

> **2.      There Is A Genuine Dispute Of Fact As To Whether Both Parties Participated In The Individualized Inquiry In Good Faith.**

As the Sixth Circuit has explained, "[t]he individualized inquiry is an interactive process in which both parties have a duty to participate in good faith." *Rorrer,* 743 F.3d at 1040 (internal quotation marks omitted). The "good faith" participation question often arises in the context of actually-disabled claims. There, the question is typically whether the employee has participated in good faith in determining what accommodations are necessary. One principle that emerges from the discussion in such cases, though, is that the determination of whether parties have participated in good faith does not admit to "hard and fast rules." *EEOC v. Sears*, 417 F.3d 789, 805 (7th Circuit 2005). As the Seventh Circuit explained in *Sears*:

> [n]o hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Sears*, 417 F.3d at 805 (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).

And, while *Sears* addressed the good faith standard specifically in the context of an actually-disabled claim, the Sixth Circuit has suggested that it applies broadly whenever the ADA requires an individualized inquiry. *See Rorrer,* 743 F.3d at 1040 (stating that in "[t]he individualized inquiry … both parties have a duty to participate in good faith"). Thus, the Court will apply *Sears'* admittedly somewhat vague analytical framework in assessing good faith participation here.

Using that framework, the record does not reveal which party caused the breakdown, or at the very least does not show as a matter of undisputed fact that Hartmann caused the breakdown. To be sure, there is evidence from which a jury could conclude that Graham's inability to complete the inquiry arose from shortcomings that Hartmann caused. During Hartmann's deposition, for example, he stated he obtained the November 21 letter from Dr. Khanna because Graham "called and said that they needed another up to date or more specified, or a letter that was more specific and, you know, up to date as well." (Hartmann Dep., Doc. 21, #119). However, although Hartmann testified that Graham had requested something "more specific," the November 21 letter he returned with was identical to the original July 21 letter that Hartmann had already given Graham. Moreover, Hartmann's testimony that he never spoke to Dr. Khanna in obtaining this letter (only the woman at his office's front desk) further indicates that he made little effort to comply with Graham's request for greater specificity. (*Id.* at #120–21). These facts, if true, may

suggest a lack of good faith on Hartmann's part, and thus that Graham would not be responsible for any failure to complete an individualized inquiry.

That being said, Hartmann's testimony is difficult to reconcile with Younker's deposition, where she was asked: "when you received this [July 21] note, from [Dr. Khanna], what did you do? What did you tell Mr. Hartmann, if anything?" (Younker Dep., Doc. 22, #230). Younker responded "I told him I needed a more—I would have said I needed *a more recent note* because that was a July date. We're in November-December, and I needed a recent release." (*Id.* at 230–31 (emphasis added)). Thus, if Younker's account is to be believed, Hartmann gave Graham exactly what it asked for when he returned with the November 21 letter—"a more recent note." If what Graham in fact needed was something more specific, a jury could conclude that Graham "fail[ed] to communicate" that fact, meaning that Hartmann's failure to satisfy that (unstated) request would not reflect bad faith. *Sears*, 417 F.3d at 805.

Moreover, courts have also held that, when employers are presented with ambiguous doctors' notes, their failure to call the doctor for clarification can itself indicate bad faith. *See, e.g.*, *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("If the note was too ambiguous and [the employer] did not know what [the employee] wanted, [the employer] easily could have called Dr. Fawver for a clarification."); *Dayoub v. Penn-Del Directory Co.*, 48 F. Supp. 2d 486, 494 (E.D. Pa. 1999) ("If [the employer] thought that the note was vague or if [the employer] had concerns about Dayoub's ability to perform as an instructor (or did not understand

34

the limitations described in the note), then [the employer] easily could have called the psychiatrist for a clarification." (internal quotation marks omitted)).

On this point, the Court notes that all three of Dr. Khanna's letters specifically invited Graham to contact him "[i]f there [were] any queries about this matter[.]" (Nov. 27 Khanna Ltr., Doc. 21-5, #171; July 21 Khanna Ltr., Doc. 21-6, #172; Nov. 21 Khanna Ltr., Doc 21-7, #173). Despite this invitation, the record does not indicate that Younker, or anyone else at Graham, ever contacted Dr. Khanna to clarify the letters' ambiguities, which a jury could conclude indicated bad faith on Graham's part. At bottom, the Court finds that there remains a genuine dispute of material fact as to whether both Graham and Hartmann participated in the individualized inquiry in good faith.

### 3. There Is A Genuine Dispute Of Fact As To Whether Hartmann Was Qualified For The Position Of Forklift Operator

Notwithstanding Graham's failure to demonstrate as a matter of undisputed fact either that it completed the individualized inquiry, or that the inquiry's breakdown was Hartmann's responsibility, Graham might still *theoretically* prevail if it could show—again as a matter of undisputed fact—that Hartmann was not otherwise qualified for the position of Production Specialist. The Court emphasizes, as it did above, that this path to victory at the summary judgment stage is largely "theoretical," as courts in this circuit hesitate to grant summary judgment to an employer when the employer cannot show that it at least attempted to complete the individualized inquiry. *See, e.g., Holiday,* 206 F.3d at 643 (reversing summary judgment for the employer where "(i) there [was] no indication that the [employer's]

physician conducted the individualized inquiry mandated by the ADA, and (ii) [the applicant had] adduced sufficient evidence to raise an issue of fact as to whether he [was] otherwise qualified to perform as a police officer"); *Denoewer,* 2020 WL 1244194, at *7 ("Where there are unresolved questions of material fact regarding the adequacy of an individual inquiry and the defendant's reliance on inadequate examinations in making employment decision, Courts find that summary judgment is inappropriate.").

Nor is this reluctance ill-founded. While courts tend to defer to an employer's decision-making when it results from a properly completed individualized inquiry, when that inquiry is lacking, no such deference attaches. And absent such deference, the existence of any competing evidence from the employer and employee as to whether the employee was qualified creates a jury question, thereby rendering the matter inappropriate for adjudication at the summary judgment stage.[11]

---

[11] Although the Court finds that summary judgment for the employer is often inappropriate where the employer did not attempt to conduct an individualized inquiry, this finding should not be understood to mean that the same employer cannot prevail at trial. Rather, this Court leaves open the possibility that, at trial, the employer may prevail if the employee cannot show he or she was qualified for a given position—the employer's prior failure to conduct the individualized inquiry notwithstanding.

In leaving open that possibility, this Court respectfully parts ways with *EEOC v. M.G.H. Family Health Center,* where the Eastern District of Michigan concluded that an employer who does not conduct an individualized inquiry prior to taking adverse action is "estopped from arguing that the employee was not qualified after the fact." 230 F. Supp. 3d at 811. The *M.G.H.* court reached that conclusion by relying, in large part, on the Sixth Circuit's decision in *Jones v. Nissan North America, Inc.,* 438 F. App'x 388 (6th Cir. 2011). In that case, *M.G.H.* explained, "the Sixth Circuit took the rare step of reversing a jury verdict and ordering judgment be entered in an employee's favor because since there was no genuine issue of material fact that the employer did not complete the individualized inquiry, it was essentially estopped from asserting an honest-belief defense." *M.G.H.,* 230 F. Supp. 3d at 814.

But in *Jones,* the employer had directly stated that it "did not believe that [the employee] was unable to do the job[.]" 438 F. App'x at 399. Rather, the employer had refused to allow the employee to work because it believed that a workers' compensation chancellor

Such is the case here. Hartmann has presented at least some evidence that he was qualified to perform the position of Production Specialist, including operating heavy machinery, despite his opioid use. This includes, for example, evidence showing that he previously filled a similar role (i.e., operating a forklift) with another employer without incident while on the same medication regimen. (Reply in Supp. of Pl.'s Mot., Doc. 32, #517). But Graham, for its part, also has raised valid concerns about how these opioids might impact Hartmann's ability to operate heavy machinery, which was an essential job function for Production Specialist. (Def.'s Mot., Doc. 25, #418). Because weighing this competing evidence is a question for the fact finder, rather than the Court, the Court finds that it cannot grant summary judgment on this ground.

Because there are disputed issues as to whether: (1) Graham completed the individualized inquiry; (2) if not, who bears responsibility for that failure; and (3) whether Hartmann's opioid use rendered him unsafe to perform as a Production Specialist, the Court concludes that it must **DENY** Graham's Motion for Summary Judgment (Doc. 25), just as it denied Hartmann's.

---

had prohibited it from doing so. *Id.* Accordingly, after the court determined that the employer had never conducted an individualized inquiry, it was unnecessary to determine whether the employee was qualified for the position in question, because all parties already agreed that he was.

Thus, because *M.G.H.*'s estoppel argument lacks a firm basis in Sixth Circuit precedent, the Court declines to adopt it here.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** both Hartmann's Partial Motion for Summary Judgment (Doc. 26) and Graham's Motion for Summary Judgment (Doc. 25).

**SO ORDERED.**

January 25, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**